AIN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| SHAWN WHITENIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | 2:16-cv-00552 |
| | ) | |
| vs. | ) | Chief United States Magistrate Judge |
| | ) | Cynthia Reed Eddy |
| THOMAS ELBEL and DEPUTY NUNLEY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION[1]**

This a *pro se* civil rights action initiated by Plaintiff, Shawn Whitenight. At the time of the events giving rise to this lawsuit, Whitenight was a pretrial detainee incarcerated at Jefferson County Jail. The defendants are Warden Thomas Elbel and Deputy Sheriff Jacob Nunley. Both are sued in their individual and official capacities.

Pending is Defendants' motion for summary judgment, with brief in support (ECF Nos. 158 and 161) and Plaintiff's cross motion for partial motion for summary judgment, with brief in support. (ECF Nos. 163 and 165). The issues have been fully briefed and the factual record has been thoroughly developed. (ECF Nos. 159, 160, 164, 172, 173, 174, 175, 176, 177, 179, 180, 181, 182, and 183).

After careful consideration of the motions, the memoranda of the parties in support and opposition thereto, the material in support and opposition thereto, the relevant case law, and the record as a whole, the Court will grant Defendants' motion for summary judgment in its entirety and deny Whitenight's partial motion for summary judgment.

---

[1] In accordance with the provisions of 29 U.S.C. § 636(c)(1), all parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including trial and the entry of a final judgment. *See* ECF Nos. 26 and 104.

1

**Background[2]**

The relevant background is well known to the parties and was fully discussed in the Court's Report and Recommendation filed April 10, 2017 (ECF No. 50), adopted as the opinion of the Court on May 19, 2017. (ECF No. 64).[3] Whitenight was a pre-trial detainee being held on a number of state charges which were filed in the Court of Common Pleas of Jefferson County at Criminal No. CP-33-CR-0000001-2014. Whitenight alleges that while at Jefferson County Jail awaiting his criminal trial, his constitutional rights were violated in several respects. Initially, Whitenight alleged a plethora of claims against both Defendants based on alleged violations of his civil rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. He also asserted claims against Warden Elbel under federal and state criminal statutes, the Pennsylvania constitution, and state common law for civil conspiracy. After the Court's ruling on Defendants' motion to dismiss, which substantially limited Whitenight's claims, "[t]he only remaining claims in this lawsuit are as follows: Plaintiff's Fourth Amendment claims, the Federal Wiretap Act claims, and the Pennsylvania Wiretapping and Electronic Surveillance Act claims." Memorandum Order, 5/19/2017 (ECF No. 64 at 4). The Second Amended Complaint remains Whitenight's operative pleading. (ECF No. 34).

**Standard of Review**

The standard for assessing a Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure is well-settled. A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[2] At the time Whitenight initiated this lawsuit, he was a Pennsylvania state prisoner housed at SCI-Greene. He notified the Court on October 24, 2017, that he had been released from DOC custody. (ECF No. 92).

[3] On January 29, 2018, the parties consented to jurisdiction before a United States Magistrate Judge. The case was then transferred to the undersigned as presiding judge in the case.

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 250.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). The moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact. *See Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. *Lawrence v. City of Phila.,* 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Court of Appeals for the Third Circuit, " ' [c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.' " *Id.* (quoting *Rains v. Cascade Indus., Inc.,* 402

3

F.2d 241,245 (3d Cir. 1968)). If review of cross-motions reveals no genuine issue of material fact, then judgment may be granted in favor of the party entitled to judgment in view of the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

This standard is somewhat relaxed with respect to *pro se* litigants. Where a party is representing himself *pro se,* the filings are to be construed liberally. Thus, if the Court can reasonably read plaintiff's pleadings together with his summary judgment submissions to show an entitlement to relief, the Court should do so despite any failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall*, 454 U.S. 364 (1982); *United States ex rel. Montgomery v. Bierley*, 141 F.2d 552, 555 (3d Cir. 1969) (although a filing prepared by a prisoner may be inartfully drawn, it should be read "with a measure of tolerance"). Nonetheless, at the summary judgment stage of the proceedings, the Court is not required to credit any "bald assertions" or "legal conclusions" that are unaccompanied by evidentiary support. *Jones v. UPS,* 214 F.3d 402, 407 (3d Cir. 2000); *see also Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990) ("[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment.").

## Discussion

Whitenight alleges that while at Jefferson County Jail his telephone calls with his attorneys were improperly recorded, "eavesdropping" occurred on another call; and his legal material was improperly searched and read during his transport on May 12, 2014, from the Jefferson County Jail to the Jefferson County courthouse. Discovery has closed and the parties have filed cross-motions for summary judgment. Defendants seek summary judgment on all claims arguing that

4

Whitenight has failed to exhaust his administrative remedies or, in the alternative, that he has failed to establish a violation of his constitutional rights. Whitenight seeks summary judgment only as to the claims against Deputy Nunley. The motions are fully briefed and ripe for disposition by the Court.

A. Exhaustion under the Prison Litigation Reform Act

Defendants argue they are entitled to summary judgment because Whitenight's claims are barred procedurally by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) (the "PLRA"), as he failed to exhaust his administrative remedies before filing his action in federal court. Therefore, before turning to the merits of any claim, the Court must decide whether Whitenight exhausted his administrative remedies.

As the United States Court of Appeals for the Third Circuit stated:

> The PLRA states that '[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' 42 U.S.C. § 1997e(a). Exhaustion is considered separately for each claim brought by an inmate, and if a complaint includes both exhausted and unexhausted claims, courts will dismiss the latter but not the former. *See Jones v. Bock*, 549 U.S. 199, 219-20 (2007). The Supreme Court has held that the PLRA requires what is known as 'proper exhaustion,' meaning that inmates must comply with the rules and procedures of prison administrative systems. *See Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."). We have held that these procedural requirements are drawn from the policies of the prison in question rather than from any free-standing federal law. *Spruill [v. Gillis],* 372 F.3d [218, 231 (3d Cir. 2004)].

*Shifflett v. Korszniak*, -- F.3d --, 2019 WL 3772104, at *6 (3d Cir. Aug. 12, 2019). Because "prison grievance procedures supply the yardstick for measuring procedural default," *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004), inmates who fail to fully complete the prison grievance process are barred from subsequently litigating those claims in federal court. *See, e.g., Booth v.*

5

*Churner,* 206 F.3d 289 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001). With these standards in mind, the Court will proceed to address the exhaustion issue, and if necessary, will then address Whitenight's claims on their merits.

In a recent unpublished opinion, our court of appeals reiterated the analytical structure for a failure-to-exhaust affirmative defense:

> As formulated in this Circuit, the failure-to-exhaust affirmative defense has two distinct stages. The first inquiry is whether the prison-employee defendants can demonstrate that the inmate failed to exhaust the on-the-books remedies. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (explaining that the prison's grievance policy supplies " 'the yardstick' for determining what steps are required for exhaustion" (quoting *Spruill v. Gillis,* 372 F.3d 218, 231 (3d Cir. 2004))); *see also Ross v. Blake*, 136 S.Ct. 1850, 1859 (2016); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). If the defendants can make that showing, then at the second stage, the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her.[1] *See Rinaldi*, 904 F.3d at 268.
>
> [1] This order of evaluation is not absolute, and it is permissible to consider the second stage first, *see, e.g., Small,* 728 F.3d at 271-72, but this ordering is consistent with the prison-employee defendants bearing the burden of production at the first stage, before the inmate plaintiff inherits the burden at the second.
>
> The state of facts dictates the appropriate legal standard for evaluating the exhaustion defense. If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment. If there is a genuine dispute of material fact related to exhaustion, then summary judgment is inappropriate . . . .

*West v. Emig,* No. 18-3806, -- F. App'x --, 2019 WL 5061417, *2 (3d Cir., Oct. 9, 2019) (non-precedential). Here, because Defendants have moved for summary judgment, the analysis turns on whether any genuine issue of material fact exists and whether Defendants are entitled to judgment as a matter of law.

No analysis of exhaustion may be made absent an understanding of the administrative process available to those incarcerated at Jefferson County Jail. *Jones v. Bock*, 549 U.S. 199, 218

(2007). The Jefferson County Jail Inmate Handbook outlines the multi-tier process for the grievance procedure including the appeal process:

> Step #1 - Address the problem with correctional staff to see if they can resolve the problem. Many times an officer can resolve the situation without a grievance being filed.
>
> Step #2 - Submit a request for a grievance form giving details about the problem. At times the deputy warden can resolve the problem before there is actually a need for a grievance. If this is not possible, you will be given a grievance form.[4]
>
> Step #3 - Complete the grievance form and forward it to the deputy warden. He/she will respond to the grievance within ten (10) business days, unless detailed research is needed. If the grievance cannot be answered within the ten (10) day period, you will be notified in writing by the deputy warden.
>
> Step #4 - If the grievant is not satisfied with the deputy warden's response, you may appeal the decision to the warden. An appeal must be filed to the warden within five (5) business days. The warden will respond to the inmate's appeal within ten (10) business days.

Inmate Handbook, ¶¶ 49, 50, Revised 01/01/2012 (ECF No. 170-1, Exh O).

Defendants argue that Whitenight did not file a grievance relating to any of the remaining claims in this lawsuit. Whitenight does not deny that he failed to exhaust administrative remedies but rather argues there were a number of reasons why he did not grieve these issues. Most of these arguments can be summarily denied.

First, Whitenight argues that he completed all available administrative remedies because his complaint survived the Court's initial pre-screening and a motion to dismiss. (ECF No. 173 at ¶ 7). This argument is without merit as multiple courts have held that a district court's sua sponte screening of an inmate's complaint does not preclude a defendant from subsequently filing

---

[4] The Handbook states that, "[d]ue to the large number of request slips that staff members receive, you need to be patient and allow a reasonable time for a response. If you have not received a response in five (5) business days, you may re-submit a request." Handbook, ¶ 49.

dispositive motions. *See, e.g.*, *Garewal v. Sliz*, 611 F. Appx 926, 931 (10th Cir. 2015) ("Simply put, the fact that a district court does not dismiss a complaint under § 1915A does not mean that the complaint will necessarily withstand a defendant's challenge to its plausibility under Rule 12(b)(6)."); *Fattah v. Symons,* 2015 WL 5512344 (M.D. Pa. Sept. 16, 2015) (same holding and citing cases). Next, he argues, without any legal support, that the "continuing violations doctrine," excuses compliance with the PLRA exhaustion requirement. This argument is also without merit as the Court, through its own research, has found no cases applying the continuing violations doctrine in the context of failure to exhaust administrative remedies. Third, Whitenight argues that it would have been futile to file grievances, because several of his previous grievances were denied as "not grievable." This argument is also without merit. It is well established that "the exhaustion requirement is not subject to a futility exception." *Gerholt v. Orr*, 624 F. App'x 799, 802 (3d Cir. 2015) (citing *Brown v. Croak*, 312 F. 3d 109, 112-13 (3d Cir. 2002)); *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000) (internal citations omitted).

Whitenight's final argument, however, gives the Court pause. He argues that the grievance process was not available to him, with regard to Deputy Nunley's alleged unconstitutional conduct. He contends that he "submitted a request form to obtain a grievance form for the actions of Defendant Nunley [and] did not receive a request form response or a grievance form for administrative remedies completion." Pl's Br. at 7 (ECF No. 180). Defendants rely on the lack of any records to support their argument that Whitenight neither asked for a grievance form nor filed an actual grievance.

It does not appear from the summary judgment record evidence that Jefferson County Jail utilized carbon-copy forms or had a tracking procedure in place to record when prisoners' requests for grievance forms or actual grievances were submitted. The Court, therefore, is reluctant to grant

8

summary judgment on the basis that the any of Plaintiff's claims are procedurally barred by the PLRA on this sparse record. Accordingly, the Court will proceed to address the claims on their merits.

B.  Fourth Amendment Claims

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. While prisoners maintain Fourth Amendment protection, they have much more limited privacy interests than individuals not incarcerated and the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell. *See Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (holding that because prisoners have no reasonable expectation of privacy, even unreasonable searches of their persons, cells, and personal belongings do not violate the Fourth Amendment); *Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979). *See also Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 328-29 (2012) (noting that prison policies, including "reasonable search policies to detect and deter the possession of contraband," will not violate a prisoner's constitutional rights if they are "reasonably related to legitimate penological interests.").

The Court previously determined that Whitenight's Fourth Amendment claims were not the type of claims contemplated by the Supreme Court of the United States in *Heck v. Humphrey* which necessarily implicate the validity of a conviction or sentence.[5] Report and Recommendation, at 14, filed April 10, 2017 (ECF No. 50), adopted as the opinion of the Court on May 19, 2017. (ECF No. 64). *See Sanders v. Downs*, 420 F. App'x 175, 179 (3d Cir. 2011) ("*Heck* typically does not bar actions for Fourth Amendment violations); *Broadwater v. Fow*, 945 F.Supp.2d 574, 583–

---

[5]  The Court ruled, however, that Whitenight's claims of violations of his First, Sixth, and Fourteenth Amendment rights went to the core of his convictions and, thus, were barred under *Heck*.

9

84 (M.D. Pa.2013) (allowing Fourth Amendment search and excessive force claims to proceed under *Heck* because judgment on those claims would not necessarily invalidate outstanding conviction). The Court found Whitenight's claims regarding the recording of telephone calls with his attorney, the eavesdropping on telephone calls with his attorney, and the reading of his legal material during transport were sufficient to survive a motion to dismiss. To prevail on his Fourth Amendment claims, Whitenight must show not only that the search / seizure was unlawful, but that it caused him actual, compensable injury, that does not encompass the "injury" of his conviction and sentence. *Heck*, 512 U.S. at 386-87.

1. *Claims Against Warden Elbel*.

Whitenight's claims against Warden Elbel are two fold: (1) that his calls with his attorneys were improperly recorded and (2) that a correction officer "eavesdropped" on a telephone call he had with his attorney. Whitenight contends that Warden Elbel was advised of the ongoing policy or practice of subordinates violating his attorney-client privacy, but took no action to cease the violations and failed to review the recording equipment to ensure no violations were occurring during telephone recordings. Whitenight argues that Defendant Elbel is "liable by personal involvement and respondent superior liability."

There is no dispute that one telephone call between Whitenight and Attorney Ralph Montana was recorded and that twenty-one (21) telephone calls between Whitenight and Attorney Robert Hoffa or Attorney Hoffa's office were recorded. The following facts also are not in dispute:

\*         Jefferson County Jail has two phone systems for use by prisoners. One of the phone systems is for general prisoner use, the other is designated for secure communications between a prisoner and his/her attorney. At all relevant times, telephone services on the general prisoner line

10

were provided by Global Tel Link, a private company that provides correctional facility telephone services.

\* On the general line, a prisoner's telephone calls are recorded as a matter of course unless a particular number is coded as belonging to a particular prisoner's attorney. The general telephone system announces to the prisoner and to the person on the line that the call was from a correctional facility and that it will be recorded. The announcement occurs automatically. The recording also occurs automatically, subject to the coding of a telephone number as being of a prisoner's attorney. The jail staff at Jefferson County Jail maintains a list of telephone numbers provided by each prisoner for their telephone list. Prisoners can submit request slips adding or deleting numbers from their telephone list. If a prisoner submits a request form indicating that an attorney's telephone number should be added to his/her telephone list, the jail staff is to add a code on the telephone system indicating that number is for an attorney. The telephone calls on the general line with that telephone number are not to be recorded.

\* The second phone system maintained by Jefferson County Jail is for confidential attorney-client calls (the "legal" phone). The calls on the legal phone are never recorded.

\* On December 19, 2013, Whitenight wrote a request slip asking that Attorney Ralph Montana be added to his telephone list. The following day, Whitenight's request was marked as being "done." On December 23, 2013, one call off the general line from Whitenight to Attorney Montana's office was recorded. On December 27, 2013, Whitenight wrote a request slip asking that Attorney Montana be removed from his telephone list.

\* On December 29, 2013, Whitenight wrote a request slip informing the Jail that Attorney Robert Hoffa will be at the Jail on January 2, 2014, and requesting that he be added to the "visitor + contact list." Lt. Fleming handled Whitenight's request and responded, "atty. Hoffa

number added. Lt. Fleming." The summary judgment record indicates that twenty-one calls on the general line between Whitenight and Attorney Hoffa were recorded between January 22, 2014, through May 1, 2014.

\* On January 22, 2014, Whitenight submitted a request slip to add Edgar Snyder and Associates to his telephone list. Whitenight never placed an outgoing call to this attorney, which is confirmed by the general phone log.

\* Jury selection in Whitenight's criminal case was scheduled for May 12, 2014. In preparation for the criminal trial, the District Attorney's Office requested from Warden Elbel a copy of Whitenight's recorded telephone calls. A compact disc of the recorded calls was prepared and given to a County Detective, who listened to the CD and discovered that the CD contained a recording between Whitenight and his attorney. The County Detective then advised the District Attorney that the CD contained attorney/client privileged communications. The District Attorney then disclosed this to Whitenight's attorney and provided him with a copy of the CD. On May 16, 2014, Whitenight pled guilty to his state charges.

\* None of Whitenight's attorney/client telephone calls placed on the "legal" phone were recorded. The recorded calls at issue in this case were placed on the non-legal phone line.

Defendants acknowledge that Attorney Montana's telephone call was recorded, but explain that the recording happened because the attorney's telephone number had not been coded as an attorney number at the time the call was made. Defendants also acknowledge that twenty-one (21) calls between Whitenight and Attorney Hoffa were recorded. According to Defendants, this occurred because Lt. Fleming had not properly coded Attorney Hoffa's telephone number as an attorney telephone number in the phone system. Therefore, Attorney Hoffa's number was not

12

exempted from the general rule that all calls on the general line are recorded unless specifically coded not to be.

Whitenight responds that both "incoming" and "outgoing" attorney calls were recorded and that while the "outgoing" calls have been produced, the "incoming" calls "have been wantonly destroyed and not produced." Pl's Concise Stmt. of Facts, ¶ 5 (ECF No. 176). Whitenight also argues that because Attorney Hoffa was not provided the "secure" telephone number, he would call the Jail's "general" line and then be transferred into the "legal" telephone in the attorney-client conference room. *Id.* at ¶ 8. Whitenight acknowledges that both he and Attorney Hoffa heard the automated notice that the calls were being recorded, but "assumed the recording of confidential calls were in error . . . ." *Id.* at ¶ 10.

Whitenight also alleges that on April 24, 2014, while he was having a telephone call with his attorney in the video room, Lt. Ishman stood outside the room and eavesdropped on his phone call.

After careful consideration of the entire summary judgment record, the Court finds that there is not sufficient evidence from which a reasonable fact finder could find that Warden Elbel violated Whitenight's Fourth Amendment rights.

There are "two general ways" in which a supervisor-defendant may be liable: (1) where the supervisor established a policy, custom, or practice that caused the harm; or (2) where the supervisor personally participated in the constitutional violation. The United States Court of Appeals for the Third Circuit explained these two general types of supervisory liability as follows:

> First, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr*., 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist*., 882 F.2d 720, 725 (3d Cir. 1989)). Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's

13

rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in the subordinate's unconstitutional conduct. *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995) ). "Failure to" claims—failure to train, failure to discipline, or, as in the case here, failure to supervise—are generally considered a subcategory of policy or practice liability.

*Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316-19 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, -- U.S. --, 135 S.Ct. 2042, 2043 (2015).

There is no doubt that Whitenight's claims are troubling. However, Whitenight has produced no credible evidence from which a reasonable fact finder could find that Warden Elbel "established and maintained a policy, practice, or custom" which resulted in Whitenight's constitutional rights being violated or that Warden Elbel directly participated in violating Whitenight's rights, directed others to violate them, or, "as the person in charge, had knowledge of and acquiesced" in any of the conduct which forms the basis of this lawsuit.[6] Specifically, the summary judgment evidence reflects that Warden Elbel was not involved in the coding of any of Whitenight's telephone numbers or that Warden Elbel instructed anyone to enter the information into the system in such a way that attorney calls on the general line would be recorded. Warden Elbel was not aware that Whitenight's calls to his attorney were being recorded and did not listen to the recordings of Whitenight's calls. Warden Elbel was not aware prior to providing the CD to the County Detective that calls between Whitenight and his attorney on the general line had been recorded. Once he was alerted to this situation, the coding problem was corrected.

Further, the summary judgment record is void of any credible evidence that Lt. Ishman actually overheard what Whitenight was saying on the telephone. But more importantly, there is no evidence that Warden Elbel instructed Lt. Ishman, or any correction officer, to eavesdrop on

---

[6] In his Answers to Interrogatories, Warden Elbel stated that he was not aware of the recording of any other telephone calls between any other prisoners / pretrial detainees and their attorneys at the Jefferson County Jail during his tenure as warden. (ECF No. 160-1 at 4).

Whitenight's calls with his attorney or that Warden Elbel was aware that Lt. Ishman, or any one else, was eavesdropping on Whitenight's telephone calls with his attorney.

As such, summary judgment will be granted to Warden Elbel on Whitenight's 1983 claims.

2. *Claims Against Deputy Nunley*

Whitenight claims that Deputy Nunley illegally searched and read his confidential legal material during transport from the Jefferson County Jail to the Jefferson County Courthouse on May 12, 2014. Second Amended Complaint, at ¶ 24 (ECF No. 34). According to Whitenight's Declaration, on May 12, 2014,

> 3. [he] was prepared by Jail staff of the Jefferson County Jail to attend jury selection in my criminal case at the Jefferson County Courthouse. Prison staff executed a complete strip search of my person and completed a thorough search of my attorney-client documentation / case documents that I was taking to the hearing.
>
> 5. Upon entering the Sally port garage of the Jefferson County Jail and entering the rear passenger door of the Jefferson County Sherriff's vehicle, Defendant Deputy Nunley denied me the ability to maintain the physical possession of my attorney-client documents in the rear of the vehicle.
>
> 7. Defendant Deputy Nunley threatened physical force upon me if I did not turn over the documents. After a short verbal disagreement, I turned over the documents as to not escalate the situation.
>
> 8. Sherriff's Deputies did not conduct a physical search or pat down of my person before entering the Sherriff's vehicle for transport.
>
> 10. During transport, Defendant Nunley was sitting in the front passenger seat, opened my attorney-client documents, searched thru the attorney-client documents and read my attorney-client documents.
>
> 13. While holding and reading my attorney-client documents and still in transit to the Courthouse, Defendant Nunley turned up the FM radio to a level where I could not hear any conversation being completed from the front seat of the vehicle.
>
> 14. Defendant Nunley then proceeded to place a telephone call utilizing his cellular telephone. Upon an unknown individual answering the call, Nunley holding and looking directly at my attorney-client privileged documents, reading them while completing a short conversation on the telephone.

> 15. Upon the completion of the telephone call, Defendant Nunley placed my attorney-client documents back into the legal folder and then turned down the FM radio volume where I could once again hear their conversations completed within the front seat of the vehicle.
>
> 17. Deputy Nunley's actions without a shadow of a doubt, went beyond his duty to search my attorney-client privileged documents for contraband. I would have no problems with the Defendant conducting an appropriate search as needed for safety while within my presence.

Pl's Declaration in Support of Partial Summary Judgment (ECF No. 164) (quoted verbatim).

To the extent that Whitenight is alleging that Deputy Nunley's <u>search</u> of his legal material was a violation of the Fourth Amendment, such a claim fails. The Fourth Amendment's prohibition on unreasonable searches does not apply in prison. *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). Additionally, the Jefferson County Sheriff's Office Transport Operations, specifically states, that transporting deputies:

> must conduct a thorough search of the detainee <u>and all possessions of the detainee before placing the person in the deputy's vehicle, making sure that no weapons or contraband was overlooked</u>. The deputies shall never assume that a search was made by another deputy.

Jefferson County Sheriff's Office Transport Operations, III(B)(7), Jan. 1, 2013 (ECF No. 165 at 9) (emphasis added).

Whitenight argues that Deputy Nunley violated his Fourth Amendment rights by "failing to follow Jefferson County Sherriff's (sic) department procedures and policies" as his legal material was searched after he was placed in the deputy's van. Pl's Br at 6 (ECF No. 165). However, a violation of an internal prison policy does not automatically rise to the level of a constitutional violation. "[A] prison policy manual does not have the force of law and does not rise to the level of a constitutional violation." *Atwell v. Lavan*, 557 F. Supp. 2d 532, 556, n.24 (M.D. Pa. 2008) (citing *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 14, 154 (3d Cir. 2004)); *Estrella v. Hogsten*, 2007 WL 2065879 (M.D. Pa. July 16, 2007) (holding that mere failure of prison

officials to follow their own regulations alone is not a constitutional violation). Consequently, Deputy Nunley cannot be liable simply for violating a prison policy.

Likewise, to the extent that Whitenight alleges that Deputy Nunley's <u>reading</u> of his legal material was a violation of the Fourth Amendment, such claim fails.[7] It is well settled that prisoners are entitled to unobstructed and confidential communication with attorneys and that interference with such communications may implicate a violation of a constitutional right, but not a violation of the Fourth Amendment. *See Iqbal v. Hasty*, 490 F.3d 143, 170 (2d Cir. 2007) (detainee's allegations of interference with attorney-client communication pled a Sixth Amendment claim), *aff'd in part, rev'd in part, and remanded on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Williams v. Price*, 25 F. Supp. 2d 605, 519 (W.D. Pa. 1997) (holding confidentiality of attorney-client communications does not present a court access claim after *Lewis v. Casey*, 518 U.S. 343 (1996); it must be asserted under the First Amendment, Sixth Amendment, or the due process right of privacy.)

For all these reasons, summary judgment will be granted to Deputy Nunley on Whitenight's § 1983 claims.

---

[7] There appears to be conflicting evidence in the record as to whether Deputy Nunley read Whitenight's legal material. In his answers to interrogatories, Defendant Nunley specifically states that he did not open the envelope with Whitenight's legal documents and did not discuss or divulge its contents with anyone. He also avers that he contacted "other deputies at the Courthouse to coordinate for the proper transfer of Plaintiff from the vehicle to the Courthouse. The deputies were arranging for Plaintiff's arrival to ensure that he would not be prejudiced by any media or jurors seeing him cuffed and shackled." *See* Pl's Br. in Support of Partial Summ. J., Exh. 2, Ans. to Interrogatories, Nos. 4, 5, 7, 9, and 11. (ECF No. 165). Whitenight responds that he "was an eyewitness to the actions of Defendant Nunley . . . ." Pl's Opp'n Br. at 11 (ECF No. 180). Even accepting Whitenight's version of the events, there simply is no Fourth Amendment violation; therefore, it is not necessary to address the parties' conflicting positions.

C. Statutory Wiretapping Claims

Initially, Whitenight attempted to bring a series of statutory claims against Warden Elbel. Amended Complaint, ¶¶ 104 - 146, inclusive. (ECF No. 34). The ruling on Defendants' motion to dismiss limited Whitenight's statutory claims to alleged violations of the Federal Wiretap Act, 18 U.S.C. § 2511, and the Pennsylvania Wiretapping and Electronic Surveillance Act, 18 Pa. C.S.A. § 5703. Although both are criminal statutes, civil remedies are available to persons whose wire, electronic, or oral communications have been <u>intentionally</u> intercepted. *See* 18 U.S.C. § 2520 and 18 Pa. C.S. § 5725(a). *See also Citron v. Citron*, 539 F. Supp. 621 (S.D.N.Y. 1982), *aff'd*, 722 F.2d 14 (2d Cir. 1983), *cert. denied*, 466 U.S. 973 (1984) (denying claim for money damages for alleged violation of the Federal Wiretap Act in the absence of intent or reckless disregard); *Kline v. Sec. Guards, Inc.*, 159 F. Supp. 2d 848, 853 (E.D. Pa. 2001) (nothing that violations under § 5725 require intent), *vacated and remanded on other grounds,* 386 F.3d 246 (3d Cir. 2004).

Whitenight has produced no credible evidence that anyone, much less Warden Elbel, intended to intercept his attorney-client telephone calls. Rather, the summary judgment evidence demonstrates that the recordings resulted because of mistakes by Jail employees who failed to properly code the attorney telephone numbers on the general system. To that end, the record is completely void of any evidence from which a reasonable fact finder could find that Warden Elbel personally entered the coding on the calls in question, that Warden Elbel instructed any subordinate to miscode the attorney telephone numbers, that he personally listened to the telephone calls in question, or that he instructed any subordinate to listen to the telephone calls in question.

The Court finds that because there is no evidence of an intentional recording of Whitenight's attorney telephone calls, there is no violation of either the Federal Wiretap Act, 18

U.S.C. § 2511, or the Pennsylvania Wiretapping and Electronic Surveillance Act, 18 Pa. C.S.A. § 5703. Accordingly, summary judgment is appropriate on both the federal and state wiretap claims.

**Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment in its entirety and deny Plaintiff's Motion for Summary Judgment. An appropriate Order follows.

Dated: December 27, 2019          BY THE COURT:


                                  s/Cynthia Reed Eddy
                                  Cynthia Reed Eddy
                                  Chief United States Magistrate Judge



cc:     SHAWN WHITENIGHT
        182 Evansville Road
        Berwick, PA 18603
        (via U.S. First Class Mail)

        All Attorneys of Record
        (via ECF electronic notification)